OPINION OF THE COURT
Shirley Werner Kornreich, J.
This is a declaratory judgment action. Plaintiff Courtroom Television Network LLC (Court TV) is a “national cable television network dedicated to reporting on legal and judicial systems of the United States, the 50 states, and the District of Columbia.” Court TV seeks a judgment holding New York Civil Rights Law § 52 unconstitutional under the First Amendment to the US Constitution and/or article I, § 8 of the New York Constitution, as well as an order permanently enjoining the statute’s enforcement.
Court TV now moves for partial summary judgment, submitting the affidavit of Douglas P. Jacobs, its executive vice-president and general counsel, copies of pleadings and other documentary evidence. The State of New York and George E. Pataki (State defendants) cross-move for summary judgment dismissing the action. In support of their cross motion, and in opposition to Court TV’s motion, State defendants submit the affidavit of Harriet B. Rosen, Assistant Attorney General in the office of Eliot Spitzer, and other documentary evidence. Defendant Morgenthau also opposes Court TV’s motion.[1]
*330 The court holds that Civil Rights Law § 52 does not violate the First Amendment to the United States Constitution or article I, § 8 of the New York Constitution.
Legislative Background
Since 1909, the public’s right to attend trials in New York has been guaranteed by statute. (See Judiciary Law § 4.) Enacted the same year, Civil Rights Law § 12 codifies the Sixth Amendment to the US Constitution, protecting criminal defendants’ rights to a fair, public trial. In 1952, the New York Legislature enacted Civil Rights Law § 52,[2] which provides, in pertinent part:
“No person, firm, association or corporation shall televise, broadcast, take motion pictures or arrange for the televising, broadcasting, or taking of motion pictures within this state of proceedings, in which the testimony of witnesses by subpoena or other compulsory , process is or may be taken, conducted by a court, commission, committee, administrative agency or other tribunal in this state . . . .”
A 1962 amendment to section 52 allows audiovisual coverage at specified proceedings of the New York State Legislature and State commissions, provided consent is obtained from the legislative body and the testifying witness and a determination is made by the Legislature that the coverage is “in the public interest.” (See Civil Rights Law § 52.) A second amendment, passed in 1976, permits, under the same protective conditions, televising of “public hearings conducted by the public service commission with regard to rates charged by utilities.” (See id.)
On March 26, 1952, Governor Thomas E. Dewey signed the bill into law, noting:
*331 “It is basic to our concept of justice that a witness compelled to testify have a fair opportunity to present his testimony. No right is more fundamental to our traditional liberties. The use of television, motion pictures and radio at such proceedings impairs this basic right. Batteries of cameras, microphones and glaring lights carry with them attendant excitement, distractions and the potential for improper exploitation and intolerable subversion of the rights of the witness. Official proceedings must not be converted into indecorous spectacles.
“It is difficult enough for the ordinary witness to overcome the nervousness in the presence of a large room full of people, a court, jury or investigating committee and the press. It is impossible if the witness is placed in front of glaring lights and knows he is being seen or heard by millions of people.” (Public Papers of Governor Dewey at 324-325 [1952].)
Court TV posits, and defendants do not dispute, that the passage of Civil Rights Law § 52 should be viewed as part of the “national backlash” engendered by photographic coverage of such notorious cases as the 1935 trial of Bruno Hauptmann in New Jersey. (Complaint 11 38.) Hauptmann was accused of the kidnapping-murder of Charles A. Lindbergh’s 18-month-old son. (See Kielbowicz, The Story Behind the Adoption of the Ban on Courtroom Cameras, 63 Judicature 1, 17 [June-July 1979].) Press coverage substantially disrupted the proceedings. One oft-cited commentator called the trial a “Roman Holiday” where “[p]hotographers clambered on counsel’s table and shoved their flashbulbs into the faces of witnesses.” (Id. at 17.) After newsreel photographers violated strict access restrictions he had imposed, the judge barred any further photographic coverage, and the New Jersey Attorney General demanded that the newsreel companies “withdraw the trial footage from exhibition.” (Id. at 19.) Although two newsreel companies complied with the Attorney General’s demand, two did not. Industry sources estimated that footage of the trial “played in 10,000 of the nation’s 14,000 movie theaters.” (Id.)
Reaction to the Hauptmann trial took the form of efforts by legislators, judges and bar association leaders to ban photographic coverage of court proceedings. (Kielbowicz, supra at 20.) In 1937, the American Bar Association (ABA) adopted Judicial Canon 35, which provided that
*332 “Proceedings in court should be conducted with fitting dignity and decorum. The taking of photographs in the courtroom, during sessions of the court or recesses between sessions, and the broadcasting of court proceedings, degrade the court and create misconceptions with respect thereto in the mind of the public and should not be permitted.” {See id. at 14.)
In 1952, the same year New York enacted Civil Rights Law § 52, the ABA “amended Canon 35 to proscribe televised court proceedings.” (Complaint 1Í 39.)
In 1965, the United States Supreme Court confronted the issue of audiovisual coverage of court proceedings in the case of Estes v Texas (381 US 532 [1965]). The question presented was whether petitioner Billy Sol Estes, a “much-publicized financier” {id. at 552) who stood convicted of “swindling” in the District Court for the Seventh Judicial District of Texas, was deprived of his “right under the Fourteenth Amendment to due process by the televising and broadcasting of his trial.” {Id. at 535.) Justice Clark described the scene at the pretrial hearings on a defense motion to preclude audiovisual coverage:
“All available seats in the courtroom were taken and some 30 persons stood in the aisles . . .
“Cables and wires were snaked across the courtroom floor, three microphones were on the judge’s bench and others were beamed at the jury box and the counsel table. It is conceded that the activities of the television crews and news photographers led to considerable disruption of the hearings . . . All of this two-day affair was highly publicized and could only have impressed those present, and also the community at large, with the notorious character of the petitioner as well as the proceeding.” {Id. at 535-537.)
The Court in Estes held that conditions during the pretrial hearing and the trial itself violated the petitioner’s due process right to a fair trial. {See id. at 543.) Particularly troubling to the Court was the potential, but immeasurable, prejudice on the minds of the jurors arising whenever a notorious trial, by virtue of being televised, becomes a “cause ce le bre.” {Estes, supra at 551.) The Court also was concerned that in such cases jurors would be “distracted,” not only by the physical aspects of audiovisual coverage (which the State in Estes argued were de minimis), but also by the “awareness of the fact of telecasting *333 that is felt by the juror throughout the trial.” {Id. at 546.) In this connection, the Court observed that “[w]e are all self-conscious and uneasy when being televised.” {Id.) Other potential risks addressed by the Court were the impairment of witness testimony, the administrative burden on the trial judge, and the mental “harassment” of the defendant caused by “inevitable close-ups of his gestures and expressions during the ordeal of his trial.” {Id. at 549.) The Court in Estes rejected the State’s argument that no constitutional violation could be found because the defendant did not make a “showing of actual prejudice.” {Id. at 542.) Instead, the Court held that the case was one in which “a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process” even without an actual showing of prejudice to the defendant. {Id. at 542-543; but see Estes, supra at 587 [Harlan, J., concurring] [limiting the holding in Estes to “what was done in this case”].)
“In the mid-1970s, State courts began authorizing broadcast coverage of judicial proceedings, on either an experimental or permanent basis.” (1994 Report of Fed Jud Ctr, Electronic Media Coverage of Federal Civil Proceedings: An Evaluation of the Pilot Program in Six District Courts and Two Courts of Appeal [FJC Report], at 3.) For example, in 1977, the Florida Supreme Court initiated a pilot program allowing the electronic media to televise and photograph civil and criminal judicial proceedings in all courts of the State of Florida, subject to specific restrictions on types of equipment, light and noise levels, camera placement and audio pickup, and subject to the “reasonable orders and direction of the presiding trial judge in any such proceedings.” (In re Petition of Post-Newsweek Stas., 347 So 2d 402, 403 [Fla 1977].) After reviewing the results of the pilot program, the Florida Supreme Court decided that the Florida Code of Judicial Conduct should be amended to allow audiovisual coverage of trials, subject to the trial judge’s authority to conduct the proceedings so as to ensure a fair trial. {See Complaint 11 50.)
In 1980, the Judicial Council of California initiated a pilot program authorizing audiovisual coverage of trial and appellate court proceedings. {Id. 11 51.) A report submitted to the California Chief Justice’s Special Committee on the Courts and the media by an independent consultant found that the “postulated distraction-decorum effects,” such as witness distraction, attorney grandstanding or general disorder, had generally not oc *334 curred during the pilot program. (See affidavit of W. Burrell, exhibit K, at 243.) After reviewing the results of the pilot program, which was extended twice, California enacted rules authorizing audiovisual coverage of court proceedings. (See complaint 1 55; see also Cal Rules of Court rule 980 [2003].)
Neither Florida nor California made the decision to allow audiovisual coverage on constitutional grounds. When the Florida Supreme Court revised its Canon 3A (7) to permit audiovisual coverage, it did so “upon its supervisory authority over the Florida courts, and not upon any constitutional imperative.” (See Chandler v Florida, 449 US 560, 569-570 [1981].) Similarly, in adopting rule 980 of the California Rules of Court in 1984, California’s Judicial Council was aware of the important constitutional issues surrounding the issue, but based its decision, instead, on “the court’s inherent right to control access.” (See KFMB-TV Channel 8 v Municipal Ct., 221 Cal App 3d 1362, 1366, 271 Cal Rptr 109, 111 [4th Dist 1990].)
More or less contemporaneously with state court developments, the ABA Committee on Fair Trial-Free Press “proposed revised standards” to Canon 3A (7), the successor to Canon 35, whereby courtroom coverage by electronic media would be permitted “under conditions to be established by local rule and under the control of the trial judge.” (See Chandler, supra at 564.) The revision was rejected by the ABA House of Delegates on February 12, 1979, but Canon 3A (7) was ultimately amended in 1982 to permit electronic coverage of court proceedings under “guidelines which allow such coverage in a manner that will be unobtrusive, will not distract the trial participants, and will not otherwise interfere with the administration of justice.” (See Ranji, Cameras Come to Court, Natl LJ, Jan. 30, 1984, at 1.) In 1978, the “Conference of State Chief Justices, by a vote of 44 to 1, approved a resolution to allow the highest court of each state to promulgate standards and guidelines regulating radio, television, and other photographic coverage of court proceedings.” (See Chandler, supra at 564.)
From 1980 to 1986, the United States Supreme Court decided several cases bearing on the issue of cameras in the courtroom. In Chandler (supra), the Court upheld the constitutionality of Florida’s Judicial Canon 3A (7) authorizing judges to permit audiovisual coverage of court proceedings, even over the objection of the defendant in a criminal case. The Chandler court viewed Florida’s decision to allow audiovisual coverage of court proceedings as “an exercise of authority reserved to the states under *335 our federalism.” (Id. at 578.) The Court held that Florida’s Canon was not per se unconstitutional, reasoning that its decision in Estes (supra) did not impose a per se constitutional ban on televising court proceedings. (See Chandler, supra at 574, citing Justice Harlan’s concurrence in Estes.) Though the appellants’ trial in Chandler had attracted substantial publicity, the Court held that the appellants made “no showing that the trial was compromised by television coverage, as was the case in Estes.” (Id. at 582.)
In a “quartet”[3] of cases beginning with Richmond Newspapers, Inc. v Virginia (448 US 555 [1980]), and culminating in Press-Enterprise Co. v Superior Ct. (478 US 1 [1986] [Press-Enterprise II]), the Court held that the First Amendment to the US Constitution implicitly guarantees the public (including the press) a right to attend criminal trial proceedings.[4] Richmond involved the fourth attempt by the State of Virginia to try the defendant for second degree murder, the first having yielded a conviction which was overturned because of improperly admitted evidence, and the subsequent two having ended in mistrials. The Court in Richmond held that the trial judge could not constitutionally close the fourth trial to the public, even where neither party objected to the closure, “without any demonstration that closure is required to protect the defendant’s superior right to a fair trial, or that some other overriding consideration requires closure.” (Richmond, supra at 564.) In explaining how it derived an “unarticulated right” of access from the First Amendment, the Richmond court invoked the “history of criminal trials being presumptively open since long before the Constitution,” and held that “the First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public at the time that Amendment was adopted.” (Id. at 575-576.)
Two years after Richmond, the Court in Globe Newspaper Co. v Superior Ct. (457 US 596 [1982]) held unconstitutional as applied a Massachusetts statute requiring the judge at “trials for specified sexual offenses involving a victim under the age of 18, *336 to exclude the press and general public from the courtroom during the testimony of that victim.” (Id. at 598.) In a trial for the rape of three underage girls, the judge ordered the courtroom closed to the public, relying on the statute. Applying strict scrutiny, the Court agreed with the State that its interest in “safeguarding the physical and psychological well-being of a minor” was compelling, but held that the statute was not a “narrowly tailored means” of accommodating that interest, because the interest could be “served just as well by requiring the trial court to determine on a case-by-case basis whether the State’s legitimate concern for the well-being of the minor victim necessitates closure.” (Id. at 608-609.) On the other hand, the Globe court restated what it said in Richmond, that “[o]f course, limitations on the right of access that resemble ‘time, place, and manner’ restrictions on protected speech would not be subjected to such strict scrutiny.” (See id. at 607 n 17 [citations omitted], quoting Young v American Mini Theatres, Inc., 427 US 50, 63 n 18 [1976], and citing Richmond, supra at 581-582 n 18.) Rounding out the quartet, the Court in Press-Enterprise Co. v Superior Ct. (464 US 501 [1984] [Press-Enterprise I]) and Press-Enterprise II (supra) expanded the scope of Richmond and Globe to encompass a trial judge’s closure of voir dire proceedings and pretrial hearings in a criminal case.
During the early 1980s, efforts were made in the New York State Legislature to develop legislation amending Civil Rights Law § 52 to allow cameras in the trial courts. (See DiLello, Issues In Focus, Senate Research Service, Apr. 20, 1995, at 4 [Issues].) In 1982, the Chief Judge of New York promulgated rules authorizing audiovisual coverage of court proceedings. (See 22 NYCRR 29.1 et seq.) The rules provided for “electronic photographic recording of proceedings” in appellate courts. In addition, the rules authorized audiovisual coverage of trial court proceedings pending the Legislature’s removal of the ban imposed by Civil Rights Law § 52.
The New York Legislature’s Experiment With Audiovisual Coverage of Trials
On January 7, 1987, the New York State Legislature acted for the first time to lift section 52’s ban on audiovisual coverage in trial court proceedings. Judiciary Law § 218 provided for audiovisual coverage on an experimental basis. In enacting the law, the Legislature stated:
“[I]n order to enhance public familiarity with the workings of the judicial system, while not interfer *337 ing with the dignity and decorum of the courtroom, the prohibition of audio-visual coverage of court proceedings should be modified for an experimental period. Accordingly, this act authorizes the chief judge of the state to permit limited, judicially supervised audio-visual coverage of civil and criminal court proceedings for a period of eighteen months, and requires the chief administrator of the courts to report to the legislature, the governor and the chief judge on the effect of such coverage on the state’s judicial system.” (L 1987, ch 113, § 1.)
Judiciary Law § 218 was signed into law on June 15, 1987 by Governor Mario Cuomo. The law provided for audiovisual coverage “upon reasonable [written] notice” and subject to the trial judge’s continuing discretion. In exercising discretion, the judge was required to consider all of the following factors: “(i) the type of case involved; (ii) whether such coverage would cause harm to any participant in the case or otherwise interfere with the fair administration of justice, the advancement of a fair trial or the rights of the parties; (iii) whether such coverage would interfere with any law enforcement activity; or (iv) [whether it would] involve lewd or scandalous matters.” (See L 1987, ch 113, § 2, adding Judiciary Law § 218 [former (3) (d)].) Consent of “counsel, parties, jurors or witnesses” was not required for audiovisual coverage. (§ 218 [former (5)].) Notwithstanding the judge’s discretion, audiovisual coverage of the following was prohibited: conferences among cocounsel, between counsel and their clients, and between counsel and the judge; conferences in chambers; jury selection and the jury during trial; undercover police witnesses; victims of sexual abuse crimes; and any coverage “liable to endanger the safety of any person.” (§ 218 [7] [former (h)].) At the conclusion of audiovisually covered proceedings, the trial judge and counsel of record were required to file with the chief administrator “a report assessing the effect of such coverage upon the proceedings.” (§ 218 [former (9)].)
Pursuant to section 218, rules were “promulgated to comport with the legislative finding that an enhanced public understanding of the judicial system is important in maintaining a high level of public confidence in the Judiciary, and with the legislative concern that cameras in the courts be compatible with the fair administration of justice.” (See 22 NYCRR 131.1 [a].) The rules, amended in 1989 and 1992, govern audiovisual coverage of trial court proceedings during “any period when audio-visual coverage in the trial courts is authorized by law.” (See 22 *338 NYCRR 131.1 [b].) For the most part, the rules track the language of Judiciary Law § 218. In addition, the rules provide trial judges specific guidance, for example, setting forth guidelines with respect to determining applications for audiovisual coverage and the use and deployment of equipment and personnel by the news media. (See id. §§ 131.4, 131.7.)
With the passage of Judiciary Law § 218, the Legislature began an experiment that would last approximately 10 years, encompassing three separate extensions of section 218 and generating four accompanying reports with recommendations. Each report recommended permanently removing section 52’s ban on audiovisual coverage. After each report, the Legislature did not follow the report’s recommendation. The first three times the Legislature extended the experiment for another period. After the fourth experimental period, the Legislature allowed Judiciary Law § 218 to expire without extension.
The First Experiment
Judiciary Law § 218 directed the chief administrator of the courts to report on the experiment and provide recommendations on future legislation. (See L 1987, .ch 113, § 3.) Accordingly, Chief Administrative Judge Albert M. Rosenblatt filed a report in March 1989 (Rosenblatt Report). The report was based on input from an advisory committee, surveys of participants in televised trials, comments received at public hearings, and review of “much of the actual content of the pertinent published and televised material.” (Rosenblatt Report at 1.)
The method of surveying trial participants was to review responses elicited in forms developed and distributed by the chief administrator. (Id. at 1.) Judges and counsel of record in trials with audiovisual coverage were required by Judiciary Law § 218 to fill out the forms; the responses of other trial participants and the media were taken on a voluntary basis. A total of 1,095 responses was received, including 525 from judges, 370 from attorneys, 168 from media representatives and 32 from witnesses. The report found that “four times as many judge respondents were favorable than were unfavorable.” (Id, at 50.) “Attorneys in the study were less favorable than judges, but only about a third of the attorneys were negative towards the process.” (Id. at 51.) “The media respondents who chose to participate in the study were highly satisfied with the process . . . (Id.) “For the small sample of witness respondents, twice as many were favorable to media coverage as were unfavorable. While about one-fourth of witness respondents reported feeling anxious and *339 nervous because of the presence of equipment, three-fourths were of the opinion that the coverage did not create undesirable noise and distractions. A very small proportion of witnesses felt that the presence of coverage made them reluctant to testify.” (Id.)
Public hearings were held and public submissions received. Several trends are evident from these responses. The most uniform responses came from the press: 31 out of 31 press representatives voiced strong support for audiovisual coverage of trial proceedings. Six out of nine judges who testified were in support of the experiment. Among attorneys, views on the experiment appeared to be strongly correlated with their clients’ interests. Five out of six attorneys testifying on behalf of district attorneys’ offices supported the experiment. Nine out of nine attorneys who testified for a legal aid or public defender organization were opposed or voiced serious concerns. Private practice attorneys expressed varying views.
The Rosenblatt Report observed that the experiment did not alter some of the fundamental views underlying the issue of audiovisual coverage. The report found that “advocates of cameras maintain — as they did before the experiment — that coverage ... is an opportunity to present actual courtroom proceedings to viewers, many of whom have never seen a proceeding, and that even modest glimpses enable the public to see and learn more than they do without cameras.” (Id. at 101.) On the other hand, “[t]he opponents of courtroom cameras assert — as they did before the experiment began — that most coverage is in the form of newscast snippets ill-suited to true edification . . . .” (Id.) Prophetically, the report surmised that “[t]hese lines of advocacy have remained largely intact, and will no doubt continue to generate debate.” (Id.)
The Rosenblatt Report drew the following conclusions. First, “the effects of coverage upon participants, its impact upon the tranquility and orderliness of the trial, the administrative burdens, and other concerns . . . have been addressed and have not been shown to adversely affect the administration of justice.” (Id. at 103.) Second, while it was “extremely difficult, if not impossible, to measure educational value in a strictly didactic sense . . . [s]eeing and hearing courtroom scenes, even without gaining textbook type knowledge has clear and compelling benefits.” (Id. at 104.) Responding to “[cjlaims that stress the possibility of harmful effects on such valued rights as the presumption of innocence,” the report found that “[t]he weight *340 of opinion . . . does not support the proposition that coverage, per se, compromises those rights . . . (Id. at 105.) With regard to “courtroom noise and disturbance,” the report found that “[t]he evils of the Lindbergh case are safely behind us, at least so far as the courtroom is concerned.” (Id. at 106 [emphasis in original].) Accordingly, the report concluded that “[t]he information gathered during this ‘experiment’ demonstrates that audio-visual coverage does not adversely affect judicial proceedings.” (Id. at 112.) The report, therefore, endorsed audiovisual coverage of trial court proceedings consistent with “the concept of judicial discretion, in preference to unfettered coverage, outright exclusion, veto power by a party or witness, or a presumption for or against coverage.” (Id. at 111.)
The Rosenblatt Report was challenged by various groups and legislators.[5] For example, on May 12, 1989, in response to the experiment and the Rosenblatt Report, the New York State Defenders Association (Defenders) published a report entitled “The Intrusion of Cameras in New York’s Criminal Courts: A Report by the Public Defense Backup Center” (Defenders Report). The Defenders Report criticized the methodology of the Rosenblatt Report and argued that “the Legislature should immediately and permanently terminate the cameras in the courts experiment.” (Affidavit of H. Rosen, exhibit 6, at 31.) The Defenders argued that the self-reporting method of questionnaires shed light only on the attitudes of participants, and failed to provide “information on the actual psychological effects of cameras on trial participants.” (Id. at 22 [emphasis in original].) Moreover, the Defenders pointed out that the surveys were of doubtful value because, due to the failure of the Office of Court Administration to “track distribution of the surveys, it is impossible to determine whether the data collected were obtained from a representative sample of individuals.” (Id. at 23.) The Defenders also observed that the sample of witnesses was minuscule. (Id.)
The Second Experiment
In the context of challenges to the Rosenblatt Report, the Legislature amended Judiciary Law § 218, authorizing a second *341 experimental period of 24 months, beginning June 1, 1989. (See L 1989, ch 115.) The primary revisions to the statute were a seven-day notice requirement; consent requirements in the context of midtrial requests for coverage, arraignments and at suppression hearings; a provision requiring attorneys to advise all witnesses of their right to request an exemption from coverage; and the creation of an advisory committee to be composed of five members, at least two of whom were required to be “by professional training or expertise, qualified to design a research methodology relevant to analyzing the impact and effect of audio-visual coverage of judicial proceedings.” (Id. § 5.) The amended statute provided for a second report by the chief administrator of the courts, which would be required to “utilize the methodological design developed by the advisory committee and the chief administrator, and shall include an analysis and conclusions as to the impact and effect of audio-visual coverage of judicial proceedings upon defendants, witnesses, jurors, prospective jurors and other participants in such proceedings.” (Id. §9.)
The second report was delivered in March 1991 (Crosson Report). An advisory committee,[6] chaired by Judge William C. Donnino, was formed in 1989. (See Crosson Report at [iv].) The advisory committee spent six months developing a new set of “individually-tailored evaluation forms for judges, attorneys, witnesses, jurors, and the media.” (Id.) The report noted that “[f]rom the first phase of the experiment to the second, the number of camera coverage orders granted dropped from 731 to 284,” attributing the decrease to the amendment prohibiting camera coverage of arraignments. (Id. at [v].)
However, the Crosson Report found that the responses of trial participants were congruent with those of the first experiment. (Id. at [v].) “During both experiments judges consistently reported that they were favorable toward audio-visual coverage and that the presence of cameras did not adversely impact upon the proceedings.” (Id. at 64.) Attorney responses also were consistent with the first experiment. In the first experiment, 43% of attorneys who responded were in favor, 25% were opposed and 32% were neutral. (Id. at 66.) In the second experiment, *342 38% were in favor, 28% were opposed and 33% were neutral. (Id.) In the first experiment, 14% of attorney respondents felt that coverage made witnesses reluctant to testify; in the second experiment, the proportion was 15%. (Id.) Similarly, a majority of responding witnesses in the second experiment were favorable to coverage (43%), or neutral (24%); in the first experiment, the proportions were 55% favorable and 20% neutral. (Id. at 67.) In the second experiment, 81% of witnesses were not distracted by the coverage and 39% felt that the proceeding was not disrupted, while 48% were neutral. (Id.) In the first experiment, 78% of responding witnesses did not think coverage created “undesirable noise or visual distractions, while 72% felt operators and equipment were unobtrusive.” (Id.) Finally, media respondents were “overwhelmingly positive . . . across the two experimental periods.” (Id. at 68.)
Public hearings were held and written submissions accepted. Many of those appearing or writing had testified at the public hearings on the first experiment. The comments summarized in the Crosson Report demonstrate the same basic trends revealed at the public hearings in the first experiment. Press representatives again were unanimous in their support for audiovisual coverage. Attorneys had varied views, but. those representing public defenders or legal aid organizations tended to oppose coverage, while those representing district attorneys tended to support it. As in the first experiment, a proportionally small number of comments were received from private individuals or organizations outside the legal system.
The Crosson Report predicted that “ [principled disagreements over the concept of cameras in courts will always be with us.” (Id. at 171.) Nevertheless, the report concluded that “the experience of a large majority of those who actually participated in the experiment leads logically to only one conclusion: cameras do not have a significant adverse effect on judicial proceedings.” (Id.) Analyzing what it saw as “the most significant issues surrounding both the concept of cameras in courts, and the 40-month experiment,” the report found “little evidence” that trial participants “play to the cameras” and suggested that “behavior actually improves.” (Id. at 143.) The report found that jurors were not significantly affected by coverage. Moreover, the report found the concern about jurors watching evening newscasts including coverage of their cases insufficient reason to deny coverage because those cases are indistinguishable from cases where jurors read newspaper accounts of their *343 trial despite being ordered not to by the judge. {Id. at 144.) The report surmised that the concern about discouraging potential witnesses from testifying was not borne out because a relatively small number of witnesses and attorneys surveyed felt this was a problem, and the law provided adequate protection for reluctant witnesses in the form of the opportunity to request exclusion of coverage and the mandated exclusion of coverage in various sensitive cases. {Id. at 145.) The report disagreed with criticism of its self-reporting methodology, arguing that “there always will be an element of subjectivity in any evaluation of cameras in court.” {Id. at 168.) “If the participants’ judgment cannot be relied upon,” the report rhetorically asked, “whose judgment can be?” {Id. at 172.)
In contrast, a 1991 Northeastern College of Criminal Justice study, entitled “Cameras in the Courtroom Make New Yorkers Reluctant to Testify” (Northeastern study), suggested that witness reluctance was a real issue. {See Rosen affidavit exhibit 9.) The study surveyed “500 randomly selected voters throughout New York State by telephone to examine their perceptions and attitudes toward crime, the criminal justice system and other related issues.” {Id. at 1.) Respondents were asked, inter alia, “how likely they would be to testify in court if they were a victim of crime and learned that the trial would be videotaped for broadcast on the evening news.” {Id.) The study found that out of 487 respondents who answered this question, “4 out of 10 potential victims [would be] less willing to testify in a criminal case.” {Id.)
The Crosson Report recommended making Judiciary Law § 218 permanent. {Id. at 173.) The Legislature engaged in substantial debate. The “Senate and Assembly Judiciary Committees held a joint public hearing on April 23, 1991, to gather testimony from the judiciary, New York State Bar Association, New York State Defenders Association, members of the media, and the public to determine whether audio-visual coverage in the courtroom should be extended, amended, made permanent, or allowed to sunset.” {See Issues, supra at 6.)
“Based on the testimony of critics of the experiment, who cited its procedural deficiencies, the Senate proposed a bill that would extend the program for 2 years, add procedural safeguards which protect witnesses from unwanted and unnecessary media coverage, and create stiffer penalties for contempt for members of the news media who violate such provisions.” {Id.) The Assembly passed a similar measure, but a key difference caused a *344 stalemate. The Senate bill included a provision which would prohibit audiovisual coverage of a nonparty witness without consent of the witness. The Assembly bill contained no such provision. Ultimately, neither side prevailed, and Judiciary Law § 218 sunset on May 31, 1991. (Id. at 6-7.)
The Third Experiment
Thirteen months later, a “critical compromise made by the Senate and the Assembly” enabled the Legislature to reenact Judiciary Law § 218, authorizing a third experiment. (See Issues, supra at 8.) The compromise was reached by including a provision requiring counsel to each party in a criminal proceeding to “advise each nonparty witness that he or she has the right to request that his or her image be visually obscured during said witness’ testimony, and upon such request the presiding trial judge shall order the news media to visually obscure the visual image of the witness in any and all audio-visual coverage of the judicial proceeding.” (See L 1992, ch 187, § 1, adding Judiciary Law § 218 [5] [c].)
The 1992 law also “added measures designed to balance the interests and the rights of the news media, judiciary, witnesses, jurors, and the parties to court proceedings and their counsel.” (See Issues, supra at 7.) For example, the third experimental law prohibited audiovisual coverage of family members of a victim or a party in a criminal case, except during that family member’s testimony; authorized audio coverage of a jury foreperson delivering the verdict (upon consent of the foreperson and subject to the trial judge’s discretion); imposed criminal contempt penalties for members of the media who willfully disobey a court order; and created a third review committee (Roberts Committee). The latter was required to “consist of twelve members, three to be appointed by the governor, three to be appointed by the chief administrator of the courts, two to be appointed by the majority leader of the senate, two to be appointed by the speaker of the assembly, one to be appointed by the minority leader of the senate and one to be appointed by minority leader of the assembly.”[7] (L 1992, ch 187, § 1, adding Judiciary Law § 218 [9] [a].)
*345 In preparing its report, the Roberts Committee (1) solicited and reviewed comments of trial judges who had taken part in audiovisual coverage during the third experiment; (2) solicited complaints, statutory violations and other concerns relating to audiovisual coverage of court proceedings from members of the Criminal Justice Section of the New York State Bar Association and from the New York State District Attorneys Association; (3) collected all applications for audiovisual coverage made during the course of the experiment, and analyzed data from such applications; (4) reviewed and analyzed prior studies and surveys relating to audiovisual coverage in New York and in other jurisdictions; (5) reviewed and analyzed information regarding audiovisual coverage statutes and rules from other jurisdictions; (6) conducted public hearings and reviewed written submissions; and (7) deliberated in private sessions.
Public hearings were held, and the same overarching trends observed in previous public hearings were again reflected. Press representatives lined up in support of permanent audiovisual coverage. District attorneys were largely supportive, while public defenders and some criminal defense attorneys voiced opposition. The primary argument advanced by camera proponents continued to be the lack of evidence of adverse effects. Meanwhile, opponents argued that “adequate research [had] not been conducted to ascertain the effect of televised trials on the public or to determine whether society as a whole benefitted from the coverage.” (See Roberts Report at 53.) Notably, the Legal Aid Society endorsed the legislation, with the safeguards instituted during the third experiment. On the other hand, the ACLU, which had previously given “qualified support for the cameras in the courts program,” opposed the program “unless the defendant is accorded the right to consent to any coverage. The [ACLU’s] change in position was based on the concerns of some that cameras interfere with [defendant’s] right to a fair trial and concerns by others that no reliable evaluation data is available.” (Id. at 67.)
*346 One novel development at the public hearings on the third experiment was the contribution of scholars who had looked closely at the issue. Paul Thaler, Director of Journalism and Media at Mercy College, opposed cameras in the courts because, in his opinion, “television creates an entirely new courtroom environment that can undermine the presumption of innocence and transform criminal defendants into public figures.” Thaler further opined that “[t]he courtroom must be a place where the process of law is carried out without being influenced by social pressures brought to bear on a particular case.” (Roberts Report at 49-50.) Dr. Roberta Entner, an instructor of communications at Rutgers University, who based her doctoral dissertation on cameras in the courts, argued that visual pictures are “creative reflectors, not reportorial mirrors of reality.” {Id. at 70.) After studying videotapes of over 50 New York cases subject to audiovisual coverage, she concluded that “the broadcast media’s need to create exciting, impressive visuals can prejudice criminal defendants, citing as an example a shot of weeping spectators immediately followed by a shot of the defendant.” {Id.)
After reviewing the record, the Roberts Committee concluded that “audio visual coverage has no adverse impact on the vast majority of participants, including, most importantly, witnesses and jurors ... In addition to facilitating greater understanding of legal principles and process, cameras in the courts afford the public the opportunity to confront the major substantive issues that court proceedings often present.” (Roberts Report at 86-87.) Analyzing the primary concerns raised by opponents to audiovisual coverage, the report found no evidence that trial participants, including judges, attorneys, witnesses and jurors, were adversely affected. The report found that fair trial arguments about the prejudicial nature of news broadcasting of trials (i.e., “sound bites” or other prejudicial editing or reporting techniques) were no less prevalent in traditional reporting and provide no reason to bar cameras from courts. {Id. at 92-98.) In sum, the report concluded that “the benefits of the program [were] substantial, with little or no adverse effect on anyone,” declared New York’s experiment with cameras in the courts a success, and recommended that Judiciary Law § 218 be made permanent. {Id. at 104.)
Minority Report
In December 1994, a Minority Report was filed (MR). Its author, Jack T. Litman, urged the Legislature “not to give permanency to the current statute permitting the coerced televis *347 ing of trials in New York State.” (MR at 1 [emphasis in original].) Litman challenged the Roberts Committee’s objectivity, criticized its methodology and disagreed with its conclusions. He stressed that “[o]f the twelve members of the Committee, eight were closely associated with the media, and two others had publicly expressed their firm pro-camera position long before formation of the Roberts Committee.”[8] (Id.)
Litman questioned the value of the data obtained in the first experiment because it was obtained “by use of a self-report questionnaire” and because jurors and defendants were not questioned. (MR at 9.) Litman noted that, “[according to social scientists, self-reporting questionnaires are highly unreliable and discredited as sociological research.” (Id.) Litman also complained that
“[b]ecause the distribution of the surveys was not tracked, it is impossible to determine whether the data collected was obtained from a representative sample of individuals who had experience with cameras in the courts. No information was available as to the number of witnesses who were exposed to cameras in the courtroom, nor on the total number of surveys distributed to witnesses . . . Only 25% of attorneys involved in audio-visual coverage responded to the questionnaire. OCA did not comment on how many of the lawyers were prosecutors or defense attorneys because the questionnaire fails to elicit this vital question.” (Id. at 9-10.)
Litman argued that, though the advisory committee established for the second experiment proposed a more appropriate methodology, it was “rejected by OCA,” and therefore, “[t]he appropriate methodology design called for by the 1989 legislation was never developed. Tapes were not voluntarily submitted, nor were they studied.” (MR at 15.) In contrast, Litman noted that the Federal Judicial Center did a “content analysis” of videotapes in its 1994 analysis of televised federal civil proceedings, resulting in a decision not to allow further audiovisual coverage. (Id.) Similarly, Litman referred to a May 17, 1991 *348 memorandum to the Senate and Assembly from Professor Bowers, the author of the Northeastern study, which “outlin[ed] the proper research methodology necessary to study and evaluate cameras in the courtroom.” {Id. at 19.) In accordance with the Bowers memorandum, Litman had suggested that the Committee use either a scientifically controlled field experiment or a “matched control group study to be conducted by a qualified research organization which is independent of OCA,” but both requests, as well as his request for a “content analysis,” were “summarily rejected” by the Committee. {Id. at 25.)
Even assuming the validity of the data collected, Litman found reason to question the conclusions of the first two experiments. For example, “thirty-seven percent of attorneys reported that the atmosphere in the courtroom was tense and 35% stated that the atmosphere was uneasy as a result of audio-visual coverage.” (MR at 16.) “Thirty-eight percent of attorney respondents stated that the testimony of witnesses was affected by audio-visual coverage . . . Five percent of the attorneys who had one or more of their witnesses receive audio-visual coverage stated that one or more of their witnesses refused to and did not testify because of audio-visual coverage . . . Forty-four percent of attorneys stated that audio-visual coverage of trials affects fairness negatively.” {Id. at 16-17.) Litman cited the statement of the Criminal Justice Section of the New York State Bar Association that “no potential witness for either side should be lost, or rendered more nervous or distracted or more fearful because of the supposed educational (or entertainment) value of televising their testimony.” {Id. at 43 [emphasis in original].)
Litman also questioned the evidence the Committee used to support its finding of educational value. The Committee relied on a nationwide survey of 1,207 adults conducted by the Times Mirror Center for the people and the press. (MR at 29.) This survey, Litman argued, was of dubious value because it called for respondents’ subjective views as to whether they were better informed as a result of watching televised coverage. {Id.) In contrast, Litman offered the doctoral work of Dr. William Petkanas (Ph.D. Dissertation, NY Univ 1990).[9] Dr. Petkanas questioned New York respondents before and after the first experiment regarding “their knowledge of basic principles that applied in our judicial system.” {Id. at 30.) Litman observed that Petkanas’ analysis “showed no additional understanding of the court *349 system found in those respondents tested a year after the camera experiment began in New York.” (Id.)
In sum, the Minority Report recommended that audiovisual coverage be allowed in criminal cases only with the consent of the defendant. The Minority Report found that the studies done on the first three experiments were not “objective” and that even using the faulty data yielded by those studies, the record compelled “a conclusion diametrically opposed to the conclusion reached by the Committee.” (Id. at 68.) In reply, the Roberts Committee argued principally that (1) the objective study recommended by the Bowers proposal would have been too costly in the absence of any appropriation by the Legislature; (2) a “content analysis” was not warranted “[b]ecause the Committee rejects Mr. Litman’s position that the public does not benefit from camera coverage of criminal trials involving violent crime and that limited coverage of court proceedings is harmful”; and (3) the Committee’s objectivity was not impaired by the affiliations of its members. (Roberts Committee Reply to Minority Report at 3-8.)
The Fourth Experiment
On January 31, 1995, the day the “third experiment” was due to sunset, Governor George E. Pataki signed a bill that extended audiovisual coverage of courtroom proceedings until June 30, 1997. “Because the major procedural concerns were hashed over in the previous law . . . this re-enactment was achieved with virtually no fuss.” (Issues, supra at 9.) The Senate stated that as a result of better technology and an increase in “gavel to gavel” coverage, “New Yorkers have a better understanding of legal principles and the court process.” (See Bill Jacket, L 1995, ch 8, at 6.) However, the Senate found that “the extent of compliance with the statute by trial judges and the effect of audio-visual coverage on their conduct has not been addressed. In order to discourage violations of the statute in the future, this bill continues the experiment without giving it permanence.” (Id.)
The 1995 bill mandated the creation of a fourth advisory committee. Addressing the objectivity concerns raised by the Minority Report in the third experiment, the Legislature limited the number of media representatives allowed on the committee to two, prohibited membership by any members of previous review committees, and required that at least one member be “a professional research analyst qualified to evaluate and analyze the impact and effect of audio-visual coverage of judicial proceed *350 ings.”[10] (See Issues at 9.) The committee was asked to review the efficacy of the experiment by assessing (1) whether a public benefit accrued; (2) whether any abuses occurred; (3) whether, and to what extent, the “conduct of participants in court proceedings changes when audio-visual coverage is present”; (4) the degree of statutory compliance by judges and the media; and (5) the “effect of audio-visual coverage on the conduct of trial judges both inside and outside the courtroom.” (See Feerick Report at 27.)
Several groups submitted memoranda opposing the legislation. The Criminal Justice Section of the New York State Bar Association, citing the Minority Report in the third experiment, endorsed Judiciary Law § 218 only if “there shall be no coverage of a trial if counsel for a party objects.” (See Bill Jacket, L 1995, ch 8, at 13.) The Women’s Bar Association of the State of New York also voiced its demand that any law authorizing audiovisual coverage require the consent of the defendant in a criminal case, and include additional safeguards for children in actions affecting them (e.g., matrimonial actions) and for victims of “crimes involving domestic violence of a non-sexual nature.” (Id. at 17-18.) The New York State Defenders Association took the position that the Legislature should “disapprove any bill which would allow further experimentation with cameras in the criminal courts. Instead, it should reaffirm the 43 year-old presumption against cameras in the courts . . . .” (Id. at 28.) Meanwhile, the 1995 Bill Jacket for chapter 8 is replete with articles from editorial pages of New York newspapers in support *351 of making audiovisual coverage of trial court proceedings permanent.
The Feerick Committee’s Methodology
The Feerick Committee adopted a more thorough methodology than any of its predecessors. In preparing its report, the Feerick Committee (1) designed and conducted a written survey to assess the experience of New York judges with cameras in the courtroom; (2) contacted the Marist Institute for Public Opinion, “which agreed to survey public opinion in New York on the issue of cameras in the courtroom”; (3) “wrote to the presidents and executive directors of 150 bar associations in New York asking for information about the experience of their members”; (4) “contacted the New York Law Journal, which agreed, as a public service, to run a prominent notice of the Committee’s interest in receiving public comments”; (5) held public hearings, each announced by press release; (6) sought OCA data regarding media applications for audiovisual coverage; (7) “invited television stations around the state to provide samples of their televised courtroom footage”; (8) gathered relevant information on the policies of other states and federal courts and reviewed United States Supreme Court precedent as well as “legal and psycho-social literature in this field”; (9) sought information from “the deans of all of the law schools in New York State” regarding educational use of televised trials; (10) solicited information from “eleven jury consultants . . . about their experience with the impact of cameras in the courtroom on jurors and other trial participants”; and (11) conferred informally with media scholars, as well as “camera-experienced” attorneys and judges in New York and from other jurisdictions, including other states, and federal courts.
The Record Developed by the Feerick Committee
The Feerick Report summarized its evidentiary findings as follows.[11]
A. “Public Benefits”
1. “Public Education About the Courts”
Proponents testified that audiovisual coverage can “demystify the judicial system and allow the public to become better informed about courtroom procedures.” (Feerick Report at 27 [citing testimony of John Corporon, former news director of WPIX-TV].) “Not only do cameras educate the public about the courts in general, say camera proponents, but they shed light *352 on major societal problems.” {Id. at 28 [citing testimony of Judge Harold Rothwax, who presided over the Joel Steinberg trial, that “cameras opened ‘a window into the whole area of child abuse’ ”]; see also testimony of Jeanne Mullgrav, director of court programs at the Victims Services Agency [“cameras in the courtroom educate the public about domestic violence and other problems formerly ‘swept under the rug’ . . .”], id. at 29.) The survey of New York law school deans revealed that among the five schools which regularly used videotapes of court proceedings, “tapes of New York State Court of Appeals arguments appear to have received the widest use.” (Id.)
2. “Judicial Accountability and Public Scrutiny of the Judicial System”
The Committee noted that 63% of the approximately 350 New York State judges who responded to its judicial survey agreed that “television coverage fosters public scrutiny of judicial proceedings,” and 25% “agreed that television coverage had a positive effect on the state’s criminal justice system.” Of the 616 New York State registered voters surveyed by the Marist Institute for Public Opinion (Marist Poll), 20% agreed that “cameras in the courtroom had a positive effect on New York’s justice system.”[12] (Feerick Report at 30.)
3. “Cathartic and Deterrent Effects”
The Committee cited testimony that “sentencings in criminal cases have become an important feature of television coverage of court proceedings.” (Feerick Report at 32.) “According to some Committee witnesses, coverage of sentencing lets the public know that the personal tragedies caused by the defendant are taken into account.” (Id. at 33 [citing testimony of Bud Carey, general manager, WCBS-TV].) In addition to those “cathartic effects,” the Committee cited testimony to the effect that “ ‘televised trials have the potential power to deter viewers from criminal or wrongful acts.’ ” (Id. [citing letter dated Dec. 20, 1996 from Joseph Kelner, Esq. to the Committee].) For example, the Committee cited Steven Brill’s testimony stating that “ ‘one of the bedrock purposes of the criminal justice system . . . is . . . the embarrassment of the guilty. That is part of what deterrence is all about.’ ” (Id.)
*353 4. “Other Benefits”
The Committee cited testimony that “camera coverage has prompted witnesses to come forward who did not realize the potential significance of their testimony until they saw a case on television.” (Feerick Report at 33 [citing testimony of Honorable Howard Relin, Monroe County District Attorney].) The Committee also cited testimony suggesting that witnesses are more likely to testify truthfully when cameras are present, and that “cameras allow news to be reported ‘with greater accuracy and insight.’ ” (Id. at 34 [citing testimony of Bud Carey, general manager, WCBS-TV].) The Committee acknowledged, however, that judges surveyed were “evenly divided on the question of whether cameras in the courtroom increase the accuracy of press coverage of judicial proceedings.” (Id.) According to the Committee’s survey, only 23% of judges surveyed agreed that televised nightly news coverage accurately represents what actually takes place in New York courtrooms, while 63% agreed that “televised gavel-to-gavel coverage of court proceedings accurately represents what takes place in court.” (Id. [emphasis in original].) According to the Marist Poll, only 28% of the public “agreed that cameras in the courtroom increase the accuracy of news coverage.” (Id. at 35.)
5. “Opponents’ Views”
“Contrasting with the testimony and public comments the Committee received about the public benefits of cameras in the courtroom were the strong reservations voiced by some judges and members of the public about the educational benefits of cameras in the courtroom.” (Feerick Report at 35.) While 45% of judges surveyed agreed that “ ‘television coverage has enhanced public understanding of New York’s judicial system, 52% of the responding judges disagreed with that statement.’ ” (Id.) In addition, 80% of respondents agreed that “television coverage of court proceedings is more likely to serve as a source of entertainment than education for the viewing public.” (Id. at 35 n 149.) Of those surveyed by the Marist Poll, 61% “thought that cameras in the courtroom are a ‘bad idea.’ ” (Id.)
The Committee analyzed specific opposing viewpoints as to (a) “the nature of televised coverage”; (b) “the effect on witnesses”; (c) “fair trial implications”; and (d) “privacy concerns.”
a. “Nature of Televised Coverage”
The Committee found that “the vast preponderance of cases which received audio-visual coverage were criminal, often *354 involving a homicide or other crime ‘at the high end of the sentencing structure.’ ”[13] (Id. at 36 [citing testimony of Terence Kindlon, Esq.].) The Committee noted reaction to this fact, in the form of testimony that coverage focused on “sensational cases,” conveying a “very false sense impression of what justice is all about and what courtroom procedures are all about.” (Id. [citing letter dated Nov. 1, 1996 from Philip Learned, Chemung Bar Association].) In addition, the Committee cited testimony questioning the accuracy of televised proceedings from the point of view of the television audience. For example, George Gerbner, former Dean of the Annenberg School of Communications at the University of Pennsylvania, stated that television creates the deceptive “illusion of actually seeing [a trial] [sic] when, in fact, what you are seeing are camera angles, camera selections, editing, etc.” (Id. at 37.)
b. “Effect on Witnesses”
The Committee mentioned testimony from “spokespersons for crime victims who expressed the opinion that there is a ‘significant risk’ that cameras will have a chilling effect on a victim or witness’ willingness to report a crime or testify in court.” (Id. at 38.) The Committee noted that “Hon. Howard Relin, Monroe County District Attorney, although strongly supportive of cameras in the courtroom, testified that he had observed in court proceedings a ‘very disturbing trend’ of witness intimidation, in the form of threats of witness’ physical safety, over the past several years,” resulting in some witnesses’ reluctance to “have their face and voice disseminated on television.” (Id. at 39.)
c. “Fair Trial Implications”
The Committee acknowledged that strong fair trial concerns were evident in the results of the Marist Poll. The Committee noted that 62% of respondents thought that “television cameras in the courtroom get in the way of a fair trial, while 29% [thought] that television coverage decreases the possibility that courts will be unjust.” (Id. at 39.) Furthermore, “70% of respondents would not want their trial televised if they were a party to a civil lawsuit. 68% would not want the trial televised if they were the victim of a crime; and 69% would not want their trial televised if they were a criminal defendant.” (Id. at 40.)
*355 Additionally, the Committee observed that “[c]oncerns about the fair trial implications of cameras in the courtroom lay at the heart of much of the opposition to cameras voiced by a number of judges and criminal defense attorneys . . . .” (Id.) In this connection, the Committee mentioned the testimony of Presiding Justice Francis T. Murphy of the New York State Supreme Court, Appellate Division, First Department, who referred to “the absence of proof that the defendant will not be prejudiced by cameras in the courtroom and testified that the burden of proof should be on camera proponents to show by a fair preponderance of the evidence that the defendant will get a fair trial if cameras are present.” (Id.) The Committee also cited the testimony of Jack Litman, who asked, “[h]ow is the defendant to prove that the prosecutor acted differently than he ordinarily would have, [or] that defense counsel was more concerned with impressing prospective clients than with the interests of the defendant . . . ?” (Id.)
d. “Privacy Concerns”
The Committee noted privacy concerns raised in the context of protecting children in matrimonial proceedings. (Id. at 42 [citing testimony of Eleanor Alter, Esq.].) Also mentioned in this context was the testimony of Frank Bensel, defense counsel in the Libby Zion case, who “questioned the wisdom of forcing private litigants in a civil case to air their dispute on commercial television, where coverage of the three-month long trial competed with the afternoon soap operas.” (Id.)
B. “Compliance by Trial Judges and the Media”
The Committee found little reason to be concerned that trial judges did not perform their functions competently.[14] Testimony and public comment generally supported the view that judges satisfactorily complied with the requirements of the statute. The judicial survey revealed that judges exercised discretion under the law while employing reasonable procedures for determining whether, and to what extent to grant permission for audiovisual coverage. (Id. at 44-45.) The OCA data showed that the approval rate for applications for audiovisual coverage during the trial period was 83.5% with the most common conditions imposed (in order of frequency) being restrictions on the news media’s equipment, restrictions on photographing the *356 defendant’s face, and restrictions on revealing the defendant’s name, the victim’s name and/or face, and a prohibition on filming spectators. (Id. at 47.) The Committee’s record also contained “strong evidence of compliance by many television reporters and camera persons with the requirements and safeguards of Section 218 of the Judiciary Law.” (Id.)
C. “Effect of Audio-Visual Coverage on the Conduct of Participants in Court Proceedings”
The Committee recognized that
“[a]t the core of the debate over the wisdom of allowing cameras in the courtroom is the question of whether cameras have an impact on trial participants — the jurors, the witnesses, the lawyers or the judge — and, ultimately, on the outcome of the case. In an earlier era, the concern included a fear that the camera itself — unwieldy, noisy, and accompanied by glaring lights — might distract the trial participants from the tasks at hand. However, with the advances in technology, those fears have been laid to rest.
“What remain very much alive are the concerns about the psychological impact of the camera: how will the realization that their every word and gesture is being transmitted to a vast, unseen audience affect the behavior of trial participants?” (Feerick Report at 51.)
In analyzing these important “concerns about the psychological impact of the camera,” the Committee focused on the camera’s effect on jurors, witnesses, lawyers and judges.
1. “Effect on Jurors”
The Committee found that the two primary concerns voiced at the public hearings with respect to jurors were the potentially adverse effect of jurors watching televised coverage on the case in which they were serving, and the effect of “their realization that the eyes of the general public are upon them and will be reluctant to reach a verdict which is ‘unpopular’ with the community to which they will return after the trial.”[15] (Id. at 53.) The Committee also cited testimony of jurors in the Libby Zion *357 malpractice action against New York Hospital. Janet Dubin, jury foreperson in that case, testified that “after the trial was over, she watched televised videotapes of the trial, which she felt was ‘so different’ from being on trial.” (Id.) Her fellow juror, Edgar Green, expressed his opinion that cameras in the courtroom are “generally not helpful.” (Id.) A third juror in the Zion case, Diane De Beilis, wrote to the Committee about her “strong feelings in favor of and against the videotaping and airing of trials.” (Id.) While she felt the practice yielded educational benefits and provided incentives for more truthful witness’ testimony as well as more competent lawyering, she also found the cameras “ ‘invasive and disruptive,’ especially for those who ‘experience a sense of discomfort when in front of a camera.’ ” (Id. at 53.)
The Committee described the comments of the three “jury consultants” interviewed on behalf of the Committee:
“One was of the opinion that the presence of cameras would exaggerate the importance of the case for jurors and that, in most cases, camera coverage would be harmful to criminal defendants, in part because some defense witnesses may be less forthcoming if cameras are present. A second jury consultant felt that there was very little impact so long as there was only one camera focused on the witness box ... A third jury consultant was concerned about televised coverage that might mislead members of the public who constitute the pool of prospective jurors.” (Feerick Report at 54.)
2. “Effect on Witnesses”
The Committee noted that testimony as to the effect of audiovisual coverage on witnesses was received on both sides of the issue. The Marist Poll results showed that the public’s willingness to testify was strongly correlated to the presence of cameras. “54% of all respondents, 45% of black respondents, 41% of regular TV-trial watchers and 64% of women said they would be less willing to testify as a witness to a crime if cameras were present. In contrast, only 20% of all respondents, 16% of black respondents, 20% of regular TV-trial watchers and 23% of women said they would not be willing to testify if only newspaper reporters were present.” (Id. at 57.) The Committee *358 acknowledged that some criminal defense lawyers testified that cameras in the courtroom affect the willingness of some defense witnesses to come forward in criminal cases.[16] (Id.) The Committee also cited comments by Jack Litman that some defense witnesses would not appear even when told about their right to be obscured by the “blue dot,” and that the “deterrent and intimidating effects of cameras fall disproportionately on defense witnesses, who are typically friends and neighbors of the defendant and are less used to the criminal justice system . . . than forensic experts or police officers who routinely appear in courtrooms on the prosecution’s behalf.” (Id.)
Part II of the Committee’s judicial survey was completed only by judges who had received an application for television coverage in their courtrooms. Of these judges, 40% agreed that “witnesses were more nervous in the presence of cameras.” (Id. at 59.) Moreover, the Committee found that 32% “thought witnesses were distracted by the presence of TV cameras”; 22% “thought witnesses’ testimony was more guarded in the presence of cameras”; 3% “thought witnesses were more truthful in the presence of cameras”; and 32% “thought witnesses’ privacy was violated by the presence of cameras.” (Id.)
3. “Effect on Lawyers”
The Committee summarized the testimony of attorneys on this subject as follows.
“The experience of lawyers who had tried camera-covered cases ran the gamut from one lawyer who wrote to the Committee to say that the presence of cameras made everyone ‘extremely self-conscious,’ to another who testified that it never even occurred to him that the camera was there during a highly sensational murder trial. In between was one lawyer who testified that some lawyers are more conscious of the cameras than he would like them to be and another who expressed his view that ‘there are a number of my colleagues who believe that television in the courtroom represents essentially free advertising and I think that many times that affects the *359 way they present the case.’ ” (Feerick Report at 60.)
Meanwhile, 35% of the judges responding to Part II of the Committee’s judicial survey agreed that “lawyers came to court better prepared in cases in which TV cameras were present,” while 33% thought that “more arguments were made in camera-covered cases,” and 26% felt that “more objections were made in camera-covered cases.” (Id. at 61.)
4. “Effect on Judges”
The Committee emphasized that “[w]ith near unanimity, witnesses and interested citizens agreed that the presence of cameras had some effect on judges. There was disagreement over whether the effect was beneficial or harmful.” (Id. at 62.) Effects cited included a “watchdog impact” ensuring that judges “carefully consider motions and rulings which they might otherwise treat in a more pro forma fashion,” and the fear that “the desire for publicity may adversely affect a judge’s rulings or his or her conduct at sentencing.” (Id. at 63 [citing testimony of attorneys Luke Pittoni and Peter Moschetti].) While 52% of judges responding to the judicial survey disagreed with the proposition that cameras in the courts “tend to cause judges to issue rulings they might otherwise not issue,” 37% “agreed with that statement.” (Id. at 64.)
The Feerick Committee’s Assessment and Conclusions
Satisfied that it had “heard a broad spectrum of points of view from a wide range of persons with experience and expertise,” the Committee concluded that the foremost benefit of audiovisual coverage was “enhanced public scrutiny of the judicial system.” (Feerick Report at 66.) The Committee commented, however, that the record before it did not “establish to what extent the presence of cameras in New York State courts has actually enhanced the public’s understanding of New York’s judicial system.” (Id.) The Committee noted that judges were split on this question, and found that the vast majority of coverage was in the form of brief segments on the evening news about criminal cases involving violent crimes “which is by itself hardly sufficient to promote a detailed understanding of the judicial system.” (Id. at 67.) Regardless, the Committee had “little doubt that television coverage has drawn the public’s attention to major societal problems, such as domestic violence and child abuse, and has served a cathartic purpose for the families of some homicide victims.” (Id.) The Committee referred to testimony that “the presence of cameras may operate as a disincentive for some victims of sex crimes, domestic violence or *360 child abuse either to report such crimes or to participate as witnesses in judicial proceedings involving those crimes.” (Id.)
The Committee acknowledged the Marist Poll results, which had found that “a majority of the public would not want their trial televised if they were a party to a proceeding or the victim of a crime.” (Id. at 67.) Still, the Committee concluded that while “[w]eighing the question of public benefits is not a simple matter,” the “benefits that flow from televised coverage of the judicial process are so important that they ought not to be sacrificed by barring cameras from the courtroom across-the-board.” (Id.) Significantly, the Committee noted that in making this determination, it was guided by the precept that “ ‘what happens in a trial is a public matter’ ” and should be accessible to as many interested New Yorkers as possible. (Id. [citing testimony of Syracuse University Professor Jay Wright, executive director, New York State Fair Trial/Free Press Conference].) Consequently, the Committee struck the balance in favor of coverage, observing that “[v]ideo and photographs have become important tools in presenting news to the public, many of whom now rely on television as their principal source of information about public affairs.” (Id.)
Despite its conclusions, the Committee recognized that central to the “debate over cameras in the courtroom are concerns about the psychological impact of the camera.” (Id. at 70.) The Committee observed that “[t]he U.S. Judicial Conference brought its ‘cameras in the court’ pilot project to a halt because the ‘intimidating effect of cameras on some witnesses and jurors was cause for concern.’ ” (Id. at 71 [citing memorandum dated Sept. 22, 1995 from L. Ralph Mecham, director, Administrative Office of the United States Courts to All Judges, United States Courts].) The Committee noted that “[p]rior Committees, reviewing earlier surveys of judges, lawyers and other trial participants, concluded that evidence of impact on trial participants was too slight to outweigh the benefits of cameras.” (Id.) In addition, the Committee found support for its conclusions in the fact that “[t]he majority of states which permit camera coverage of court proceedings have reached similar conclusions.” (Id.) Weighing all the foregoing, the Committee decided that its record “[did] not show that the fears regarding the impact of cameras on trial participants have been realized in New York during the experimental period,” and, therefore, concluded that “any impact cameras may have on trial participants does not justify an across-the-board ban of cameras in courtrooms.” (Id.)
*361 The Committee recommended that the fourth experimental law be made permanent; that “defendant consent should be a prerequisite for camera coverage of bail hearings”; that “there should be no separate rule for death penalty cases”; that “judges should be vigilant in addressing the safety and privacy concerns of witnesses in both criminal and civil proceedings”; that “[OCA] should actively monitor camera-covered proceedings, make periodic reports, and, if necessary, recommend changes in Section 218 of the Judiciary Law and the implementing rule”; and that “[OCA] should develop an enhanced judicial training program to familiarize all judges with the applicable statutory and administrative provisions and safeguards.” (Id. at 77-81.)
Minority Report
A Minority Report (MR2) dated April 1, 1997 was delivered by Committee member Leonard E. Noisette. Mr. Noisette recommended that the “Judiciary Law Section 218 experiment be ended and that the statute be allowed to expire on June 30, 1997, so that, as was true from 1952 to 1987, there shall be no audiovisual coverage of New York State court proceedings.” (MR2 at 1.) Commending the Committee for developing a “record which will be helpful to the Legislature when it again considers how to deal with the matter of television cameras in our courts,” Noisette argued that “after ten years and four experimental periods, camera proponents are still unable to provide any study or empirical evidence that television coverage of court proceedings has met the statutory goals of the experiment. To the contrary, the Committee’s most important contributions— its survey of the judiciary of this state, and its New York voters survey — indicate that the experiment has been a failure in this regard.” (Id. at 2.) Further, Noisette argued that the Committee erred in presuming that “the burden is on those opposed to cameras in our courts to prove the harm they cause, instead of recognizing that camera proponents should be required to demonstrate the benefits that accrue for allowing such access.” (Id.)
Noisette questioned the Committee’s finding of a public education benefit, arguing that “meaningful public education is an aspirational goal at best.” (Id. at 3.) Noisette cited the record evidence that most coverage reached the public in the form of nightly news “snippets, which shed little light on the complex *362 ity of court proceedings.”[17] (Id.) He also cited the responses of law school deans indicating that “other than public television coverage of Court of Appeals arguments and the rare extensive, coverage of trial proceedings, there was little educational value to . . . television coverage.” (Id.) Noisette pointed to the testimony of scholars suggesting that while television coverage may have contributed to “enhanced television audiences,” there is “no evidence whatsoever” that the coverage led to enhanced public education. (Id. [citing testimony of Richard D. Heffner].)
Conceding that “openness” and “public access” are “fundamental aspects of our democratic society,” Noisette stated that the Committee’s finding of a “public scrutiny” benefit to audiovisual coverage was “unsupported by the record” because it presumed a “degree of coverage of judicial conduct that does not in fact exist.” (Id. at 6.) Noisette emphasized that “the Committee’s openness and access conclusions fail[ed] to deal with the nature of television and the difference between the experience of actually being in a courtroom and that of viewing selective and filtered TV tube images.” (Id.)
Noisette attacked the Committee’s conclusions with regard to the effect of audiovisual coverage on trial participants. Noisette argued that the Committee was unjustified in dismissing the concerns expressed by “a range of witnesses regarding the deterrent effect on witnesses,” the conclusion of the Judicial Conference of the United States that “any negative impact on witnesses or jurors could be a threat to the fair administration of justice,” the Marist Poll results “which indicated that the majority of voters would not want trials to be televised if they were criminal defendants, civil parties, witnesses or victims,” and the results of the Committee’s own judicial survey indicating that 37% of responding judges agreed that “the presence of television cameras in the courtroom tends to cause judges to issue rulings they otherwise might not issue.” (Id. at 4.) In light *363 of this evidence of “an adverse impact on trial participants and the conducting of a fair trial,” Noisette argued that the Committee’s recommendation was “not consistent with the voluminous record before it.” (Id.)
The Sunset of Judiciary Law § 218
Judiciary Law § 218 expired on June 30, 1997, when the Legislature “failed to act” to extend it or make it permanent. (Complaint II 91.) An effort to revive Judiciary Law § 218 was immediately sponsored by Senate Republican James J. Lack, but the bill “died” on the Senate floor on July 16, 1996. (See Spencer, Effort on Cameras in Courts Dies, NYLJ, July 16, 1997, at 1, col 4.) While some have called the sunset of Judiciary Law § 218 in 1997 an example of “politically created procrastination or inaction,” others see the Legislature’s inaction as a legitimate response to the important public policy issues raised during the 10-year experiment, including the broadcasting during the 1990s of many “high profile trials.” (See Balter and Simone, Diallo Case Not the Last Word on Cameras in Court, NYLJ, Mar. 16, 2000, at 1, col 1.)
Overview of Federal and State Jurisdictions
Adopted in 1946, Federal Rules of Criminal Procedure former rule 53 provides that “[t]he taking of photographs in the court room during the progress of judicial proceedings or radio broadcasting of judicial proceedings from the court room shall not be permitted by the court.” (Fed Rules Grim Pro former rule 53.) Rule 53 has been interpreted to proscribe television broadcasting of criminal trials as well. (See, e.g., United States v Moussaoui, 205 FRD 183 [ED Va 2002], citing United States v Hastings, 695 F2d 1278, 1280 [11th Cir 1983].)
“In 1972, the Judicial Conference of the United States adopted a prohibition against ‘broadcasting, televising, recording, or taking photographs in the courtroom and areas immediately adjacent thereto ....’” (FJC Report at 3.) “In September 1990, the Judicial Conference . . . authorized a three-year pilot program allowing electronic media coverage of civil proceedings in selected federal trial and appellate courts . . . .” (Id. at 4.) In 1994, after analyzing the results of the pilot program, the FJC Report recommended that “the Judicial Conference authorize federal courts of appeals and district courts nationwide to provide camera access to civil proceedings . . . .” (Id. at 43.) “By a 2-1 majority, the Judicial Conference concluded that ‘the intimidating effect of cameras on some witnesses and jurors was cause for serious concern,’ ” and rejected *364 the recommendations of the FJC Report. (See Feerick Report at 24-25.)
After the FJC rejected the recommendation of its report, several United States District Courts granted media applications for audiovisual coverage of civil proceedings on the basis that the Judicial Conference policy did not supercede local district court rules permitting coverage. (See, e.g., Marisol v Giuliani, 929 F Supp 660 [SD NY 1996]; Katzman v Victoria’s Secret Catalogue, 923 F Supp 580 [SD NY 1996].) The Judicial Conference “urged each circuit to abrogate any local rules of court that conflicted with the prohibition on cameras in the trial courts.” (See Feerick Report at 25-26.) Consequently, most United States District Courts currently prohibit audiovisual coverage of civil trials, although some local district rules allow it.
As for the state courts, it is difficult to make a definitive statement at any given point in time as to what is essentially a national patchwork quilt of policies. Still, it is undisputed that today, a substantial majority of states permit audiovisual coverage of trial court proceedings.
Conclusions of Law
Federal Constitutional Claims
In Richmond v Virginia (448 US 555 [1980]), the Court held that “everyone” has a right to “attend criminal trials to hear, see, and communicate observations concerning them.” (See id. at 576.) Consequently, the Court found that a closure of the courtroom to the public is constitutionally permitted only if it is justified by “an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.” (See Press-Enterprise I, supra at 510.) Court TV argues that Civil Rights Law § 52 effects an unconstitutional closure of the courtroom by prohibiting audiovisual coverage of trials. The court disagrees.
Standard of Review
Court TV argues that strict scrutiny should apply to section 52 under the analysis developed in the Richmond line of cases. However, the right to televise court proceedings was not among the rights recognized in Richmond or its progeny. Instead, the Richmond court indicated that restrictions on audiovisual coverage of trials, like ordinances requiring licenses for public parades or zoning laws regulating the location of adult establishments, should be treated as time, place, and manner restrictions subject to rational basis scrutiny. (See Richmond, supra at *365 581 n 18 [“(i)t is far more important that trials be conducted in a quiet and orderly setting than it is to preserve that atmosphere on city streets”], citing Cox v New Hampshire, 312 US 569 [1941]; Globe, supra at 607 n 17, citing Young v American Mini Theatres, Inc., 427 US 50, 63 n 18 [1976].) This result is consistent with Chandler, decided after Richmond, where the Court held that “there is no constitutional right to have [live witness] [sic] testimony recorded and broadcast.” (Id. at 569, quoting Nixon v Warner Communications, Inc., 435 US 589, 610 [1978].) The upshot of Chandler, Estes and the Richmond cases is that audiovisual coverage of court proceedings is neither prohibited nor required under the First Amendment. Thus, it follows that a court may impose reasonable restrictions on audiovisual coverage.
Court TV cites no case, and the court is aware of none, where an appellate court, in any state or federal jurisdiction, has applied strict scrutiny to restrictions on audiovisual coverage of trials. On the contrary, United States Courts of Appeals in the Second, Fifth, Sixth, Seventh, Tenth and Eleventh Circuits have upheld rules prohibiting audiovisual coverage of court proceedings as reasonable time, place, and manner restrictions on speech. (See Posr v Killackey, 2002 US Dist LEXIS 9604 [SD NY 2002], citing United States v Yonkers Bd. of Educ., 747 F2d 111, 113 [2d Cir 1984] [upholding court rule prohibiting use of recording devices in courtroom as reasonable time, place, and manner restriction]; Combined Communications Corp. v Finesilver, 672 F2d 818, 821 [10th Cir 1982] [“(t)he First Amendment does not guarantee the media a constitutional right to televise inside a courthouse”]; Conway v United States, 852 F2d 187, 188-189 [6th Cir 1988], cert denied 488 US 943 [1988] [court rules prohibiting broadcasting, telecasting or photographing judicial proceedings did not violate press right to be present, speak and publish concerning trials]; United States v Edwards, 785 F2d 1293, 1295 [5th Cir 1986] [right of access granted in Richmond was right to “attend, listen and report”]; United States v Kerley, 753 F2d 617, 620-622 [7th Cir 1985] [rule banning cameras from criminal trials held reasonable time, place and manner restriction on news-gathering activities]; United States v Hastings, 695 F2d 1278, 1280 [11th Cir 1983], cert denied sub nom. Post-Newsweek, Fla., Inc. v United States, 461 US 931 [1983] [right of access recognized in Richmond was “right to attend” criminal trials].)
As Judge Oakes wrote in Westmoreland v Columbia Broadcasting Sys., Inc. (752 F2d 16, 23 [2d Cir 1984]), “[t]here is a long *366 leap . . . between a public right under the First Amendment to attend trials and a public right under the First Amendment to see a given trial televised.” It is a leap the Second Circuit was unwilling to take. Similarly, the only appellate court in this state that has faced the issue since Richmond has held that there is no “right under the US Constitution to televise or otherwise broadcast” trial proceedings. (See Santiago, 273 AD2d supra at 814.) The teaching of these uncontroverted appellate authorities is that a rule barring audiovisual coverage of trial proceedings is a time, place, and manner restriction on speech subject to rational basis scrutiny.
Nevertheless, Court TV advances essentially two arguments for applying strict scrutiny to Civil Rights Law § 52. Neither persuades the court. The first focuses on the Richmond court’s citation to First Natl. Bank of Boston v Bellotti (435 US 765 [1978]), where the Court held that “[the] First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.” (Id. at 783.) At oral argument, Court TV suggested that “the stock of information certainly includes the actual proceedings of a courtroom . . . .” In papers, Court TV theorizes that Bellotti and Richmond are examples of an “extraordinarily speech-protective law” emerging from the Supreme Court’s decision in New York Times Co. v Sullivan (376 US 254 [1964]). According to Court TV the broad sweep of this jurisprudence implies a right to televise court proceedings.
The argument does not lack creativity, but it goes too far. There are “ ‘few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.’ ” (See Richmond, supra at 588 [Brennan, J., concurring], quotingZemel v Rusk, 381 US 1, 16-17 [1965].) The fact remains that Bellotti was cited in Richmond as support for the First Amendment right to attend and report on trials — not to televise them. Moreover, the Richmond court anticipated attempts, such as Court TV’s here, to expand its holding. Consequently, the Richmond court invoked the time, place, and manner doctrine as the appropriate framework for dealing with restrictions on audiovisual coverage. Indeed, the Richmond court cited Estes as a case where time, place, and manner restrictions on audiovisual coverage would have been appropriate to ensure a fair trial.
Second, Court TV argues that the press deserves special consideration as the public’s “surrogate.” Referring to the Rich *367 mond court’s historical discussion, Court TV contended at oral argument that “originally when you had a trial you’d have everybody from the community there, and as the societies have developed, it’s become less and less possible to do that, to where now only a tiny fraction of people that are interested in a trial, particularly a high profile trial, can get in the courtroom doors.” The implication is that public access means access beyond the physical limitations of the courtroom. This argument, too, is rejected by the Court in Richmond. In the same footnote where the Richmond court analogized restrictions on audiovisual coverage to time, place and manner restrictions, the Court observed that “since courtrooms have limited capacity, there may be occasions when not every person who wishes to attend can be accommodated. In such situations, reasonable restrictions on general access are traditionally imposed, including preferential seating for media representatives.” (See id. at 581 n 18 [citations omitted].) Thus, the Richmond court acknowledged that First Amendment access rights are not necessarily violated when the number of eyeballs that can observe the proceedings is in direct proportion to the number of seats in the courtroom.
In contrast, Court TV’s public surrogate argument implies that First Amendment rights are violated if access is denied to those who would watch the proceedings from their living rooms. The court finds this reading of Richmond and its progeny strained at best. The notion of trials before a mass audience has not been held in high regard by the court. (See, e.g., Chandler,; supra at 580 [“ ‘Yankee Stadium’ ‘show trials’ tell more about the power of the state than about its concern for the decent administration of justice . . .”].)
Rational Basis Analysis
In applying the rational basis test, the test the court finds applicable here, courts must “defer to the Legislature, which is presumed to know all facts that would support a statute’s constitutionality — a presumption which must be rebutted beyond a reasonable doubt. The Legislature’s actual purpose need not be apparent, for a statute is constitutional if rationally related to any conceivable legitimate State purpose.” (People v Walker, 81 NY2d 661 [1993], citing Maresca v Cuomo, 64 NY2d 242 [1984].) Therefore, the burden here is on Court TV to show that there is no conceivable legitimate state purpose for Civil Rights Law § 52. Court TV fails to make this showing.
Court TV argues that technological advances and 10 years of experiments in New York have discredited the Legislature’s *368 reasons for passing Civil Rights Law § 52. There is no dispute that Court TV’s small, silent, remote-controlled camera utilizing only natural light does not present the physical problems of television coverage which beset a bygone era. As Court TV correctly points out, this issue has not been in serious contention for some time. However, the physical disruption caused by audiovisual coverage has never been the sole rationale for section 52. The law was designed to protect the right of a witness compelled to testify to “have a fair opportunity to present his testimony.” (See Public Papers of Governor Dewey at 324 [1952].) This right was thought to be impaired not only by the “batteries of cameras, microphones and glaring lights,” which have since gone the way of hand-cranked film cameras, but also because the televised witness “knows he is being seen or heard by millions of people.” (See id.) The Legislature in 1987 recognized that technological advances alone were not sufficient to dispel all concerns as to whether audiovisual coverage could be allowed while preserving intact the ideal of fairness embodied in Civil Rights Law § 52. For this reason, it made Judiciary Law § 218 experimental, recognizing that “[t]here may be inherent problems in any court proceeding which could possibly be complicated by audio-visual coverage.” (See L 1987, ch 113, § 1.)
More important, the vast record developed during New York’s 10-year experiment contains ample evidence from which the Legislature could rationally conclude that Civil Rights Law § 52 advances the State’s interest in fair trials. As the New York experience developed, and observation of the experiments became successively more objective and comprehensive, concerns about the effect of audiovisual coverage on trial participants persisted and even increased. There was credible testimony that some witnesses had been deterred from testifying by the prospect of being filmed, while others had been negatively affected at trial.[18] There was testimony that audiovisual coverage had meaningfully affected judges’ behavior at a core level — by changing how they issued orders. There was evidence that jurors’ behavior could significantly be altered by cameras. There was the testimony of scholars who, after careful study of the issue, *369 concluded that televised trials present fundamental challenges to fairness by allowing external social pressures to exert influence in the courtroom. And, there was resounding evidence that the public, after years of exposure to televised trials, remained skeptical of their value, were less inclined to testify in front of cameras, and had developed an aversion to having their own trials covered.
The record reveals a Legislature which repeatedly modified Judiciary Law § 218, attempting to permit audiovisual coverage while preserving fairness. Sensible limitations were imposed on coverage, and by all appearances, the media acted responsibly in observing them. Nonetheless, concerns remained that witnesses were unfairly affected. As an attempted compromise, witnesses were given the right to have their image visually obscured (causing Court TV to suspend coverage in cases where witnesses exercised that right). In the end, camera proponents could not marshal enough evidence to satisfy opponents that the benefits of permanently revoking Civil Rights Law § 52 outweighed the risks. The stalemate was evident in 1997, when Assembly Democrats fashioned a bill giving any witness, including non-parties and criminal defendants, the right to shut off the camera during his testimony. The nonstarter legislation[19] revealed the depth and persistence of conviction in the Legislature that audiovisual coverage of trials impacts fairness.
A time, place, and manner restriction on courtroom access is constitutional if it is “reasonable, if it promotes ‘significant governmental interests,’ and if the restriction does not ‘unwarrantedly abridge . . . the opportunities for the communication of thought.’ ” (See Hastings, supra at 1282, citing Richmond, supra; Young, supra.) Court TV argues that even if fair trial concerns may be well founded in some cases, a per se ban on audiovisual coverage cannot be reasonable because experience has shown that trials can be fairly conducted while permitting audiovisual coverage. Court TV misapplies the rational basis standard. The record contains evidence upon which the New York Legislature could reasonably conclude that its legitimate interest in fair trials outweighs the benefits of permitting camera coverage, even on a discretionary basis. As the Federal *370 Judiciary Committee concluded, when weighing the First Amendment benefits of audiovisual coverage against fair trial concerns, any negative impact may be sufficient to tip the scales against coverage. Moreover, Civil Rights Law § 52 does not “unwarrantedly abridge . . . the opportunities for the communication of thought” because reporters are “free to attend the entire trial, and report whatever they observe.” (See Hastings, supra at 1282; see also Sarner, Justice, Take Two: The Continuing Debate Over Cameras In The Courtroom, 10 Seton Hall Const LJ 1053 [2000] [arguing that section 52 withstands rational basis scrutiny].) Thus, section 52 passes muster under the First Amendment.
State Constitutional Claims
It is well settled that “a legislative enactment carries with it an exceedingly strong presumption of constitutionality” rebuttable only by proof beyond a reasonable doubt of the statute’s unconstitutionality. (See Matter of Malpica-Orsini, 36 NY2d 568, 570 [1975], appeal dismissed 423 US 1042 [1976].) In reviewing statutes, courts must presume that “the Legislature has investigated and found facts necessary to support the legislation.” (See id. at 571, citing I.L.F.Y. Co. v Temporary State Hous. Rent Commn., 10 NY2d 263, 269 [1961].) Additionally, “[i]f any state of facts, known or to be assumed, justify the law, the court’s power of inquiry ends.” (Matter of Spielvogel v Ford, 1 NY2d 558, 562 [1956], appeal dismissed 352 US 957 [1957].) Where, as here, a party seeks facial nullification of a statute (as opposed to nullification as applied to a given set of facts), the party is required to show that “ ‘in any degree and in every conceivable application,’ the law suffers wholesale constitutional impairment.” (See Cohen v State of New York, 94 NY2d 1, 8 [1999], quoting McGowan v Burstein, 71 NY2d 729, 733 [1988].) These principles reflect the understanding that “[statutes are quintessentially the product of the democratic lawmaking process.” (See Cohen, supra at 8.) Consequently, courts may not “substitute their judgment for that of the Legislature as to the wisdom and expediency of the legislation.” {Malpica-Orsini, supra at 570.)
Here, the presumption of constitutionality is particularly appropriate, given the serious attention the Legislature paid to Civil Rights Law § 52 during its 10-year experiment with audiovisual coverage. The record amassed in the experiment shows that the Legislature, as it is presumed to have done, thoroughly investigated the question of cameras in New York courts. Four *371 reports were submitted, and a sizable record compiled. Throughout the process, Judiciary Law § 218 was revised to accommodate competing interests. Ultimately, no formulation of the law satisfied a sufficient number of legislators that fair trial concerns would adequately be protected, and section 52 remained in force. As discussed infra, the record developed in the 10-year experiment provides a rational basis for section 52 under the First Amendment.
Nevertheless, Court TV argues that a “right of televised access” is implied by the expansive language of article I, § 8 and by New York’s tradition of heightened protection of speech and the press. Section 52, Court TV contends, runs afoul of this implied right and, therefore, is invalid. The court disagrees.
New York Constitution, Article I, § 8
Article I, § 8 of the New York Constitution provides that “[e]very citizen may freely speak, write and publish his or her sentiments on all subjects . . . and no law shall be passed to restrain or abridge the liberty of speech or of the press.” Despite the bold language of article I, § 8, it is well settled that “the constitutional guarantee of freedom of speech is not an absolute right to be indiscriminately exercised under all circumstances and conditions.” (See People v Feiner, 300 NY 391, 399 [1950].) Nevertheless, article I, § 8 has been held to provide broader speech protection than the First Amendment in some cases, especially those involving freedom of expression. (See People ex rel. Arcara v Cloud Books, 68 NY2d 553 [1986] [section 8 held to invalidate court order closing bookstore after United States Supreme Court held order did not violate First Amendment]; Bellanca v New York State Liq. Auth., 54 NY2d 228 [1981] [provision of Alcoholic Beverage Control Law prohibiting topless dancing in premises licensed to sell liquor unconstitutional under article I, § 8 after United States Supreme Court found same provision constitutional].)
In like manner, the New York Constitution has been construed to give the press broader protection than the First Amendment provides. In O’Neill v Oakgrove Constr. (71 NY2d 521 [1988]), the Court held that article I, § 8 provides a qualified reporter’s privilege against disclosure of noneonfidential photographs, though no such privilege had been recognized by the United States Supreme Court. In support of its decision, the Court in O’Neill observed that
“the expansive language of our State constitutional guarantee, its formulation and adoption prior to the *372 Supreme Court’s application of the First Amendment to the States, the recognition in very early New York history of a constitutionally guaranteed liberty of the press, and the consistent tradition in this State of providing the broadest possible protection to the sensitive role of gathering and disseminating news of public events all call for particular vigilance by the courts of this State in safeguarding the free press against undue interference.” (Id. at 528-529 [internal quotation marks and citations omitted].)
Article I, § 8 of the New York Constitution is not broader than the First Amendment in every case, however. For example, in Johnson Newspaper Corp. v Melino (77 NY2d 1 [1990]), the Court of Appeals declined to recognize a state constitutional right of access to professional disciplinary proceedings, stating that “[although our Court has in some cases found our State Constitution to be more protective of expressional freedoms than the Federal Constitution, there is no such precedent with respect to the right of access.” (Id. at 8 [citations omitted]; see also Santiago, supra [finding no New York or federal precedent for right to televise court proceedings].)
In determining whether the State Constitution provides broader protection for speech than the First Amendment in a particular case, the Court of Appeals “has not wedded itself to any single methodology, recognizing that the proper approach may vary with the circumstances.” (See Immuno AG. v Moor-Jankowski, 77 NY2d 235, 251 [1991] [deciding issue of defamation law on independent state grounds while taking federal law into account].) As a guiding principle, however, the Court has held that “[t]he function of comparable provisions of the State Constitution, if they are not to be considered purely redundant, is to supplement those rights to meet the needs and expectations of the particular State.” (See Cloud Books, supra at 557.) Thus, the burden here is on Court TV to demonstrate that the “needs and expectations” of New York necessitate an expansion of state constitutional rights beyond the federal minimum guarantee.
Court TV argues that article I, § 8 should protect the media’s right to televise trials because New York recognizes the media’s important role in “gathering and disseminating news of public events.” The implication is that New York citizens need and expect televised trials. The record does not support this position. To the contrary, the record shows that, after considerable *373 experience, the Legislature (and the voters) remained unconvinced that the social value of televising trials outweighs the risks. In the Marist Poll, 61% of New York voters responded that audiovisual coverage of trials is a “bad idea.” At the very-least, the record raises a reasonable doubt that the needs and expectations of New York citizens demand a constitutional right to televised court proceedings. As a result, Court TV fails to meet its burden; on its face, Civil Rights Law § 52 does not violate article I, § 8 of the New York Constitution. The only New York appellate court to consider this issue came to a similar conclusion. (See Santiago, supra at 814 [“there is no precedent in New York recognizing (a right to televise court proceedings)”], citing Johnson, supra at 8.)
The Primacy of Fair Trial Rights in New York
Equally important, New York’s traditional respect for the fair trial principles embodied in the Sixth Amendment (codified as Civil Rights Law § 12) militates against adopting Court TV’s expansive reading of the New York Constitution. The Court of Appeals has held that “[n]ot only the individual defendant but the public at large is entitled to assurance that there shall be full observance and enforcement of the cardinal right of a defendant to a fair trial.” (See People v Crimmins, 36 NY2d 230, 238 [1975].) New York’s statutory scheme with respect to public access reflects the same paramount commitment to fair trials. Judiciary Law § 4 guarantees public access to trials; Civil Rights Law § 12 protects criminal defendants’ right to a fair public trial; and Civil Rights Law § 52 prohibits audiovisual coverage of trials. The combined effect of these statutes is that in New York, public access to trials is guaranteed, but fair trial rights take precedence where there is a conflict.
Indeed, New York appears to be unique among the states in addressing the “free press — fair trial” debate through explicit legislative commandments, instead of constitutional rules. (See Gannett, supra at 415 n 3 [45 states protect right to public trials through constitutional provisions; 2 through judicial decisions; 2 have no presumption of public trials; New York alone provides for public trials by statute].) At oral argument, Court TV suggested it is ironic that “in the state that probably has the most pro First Amendment type Constitution, the most pro press constitutional provision, we have a state that is one of nine left that has an absolute bar to cameras in the courtroom.” What Court TV labels ironic is more appropriately viewed as a reflection of the primacy in New York of fair trial rights where they conflict with the public right of access.
*374 The record demonstrates that criminal trials are overwhelmingly more likely to be televised. With this in mind, it is worthwhile to examine New York jurisprudence with respect to the inevitable conflict between public access rights and fair trial rights in a criminal prosecution. In Matter of Westchester Rockland Newspapers v Leggett (48 NY2d 430 [1979]), the Court of Appeals summarized its approach to this question. Writing for the majority, Judge Wachtler admonished that
“any right of access to court proceedings accorded to the public and the press must also take into account the equally important rights of the accused. Complete freedom to speak and publish at will is, of course, the ideal and essential limitations on that freedom should be few and carefully scrutinized. But the true measure of our society will not be judged by the freedom we grant to our great institutions as much as by the protection we provide for society’s lowliest member. And none are more lowly — none more subject to potential abuse — and none with more at stake than those who have been indicted and face criminal prosecution in our courts. For them, freedom and fair trial are not abstractions.” (Id. at 443-444.)
Judge Wachtler’s words resonate with those of many who, throughout the 10-year experiment, spoke out to protect the fundamental right of criminal defendants to a fair trial. His emphasis on fair trial rights also is consistent with the purpose of section 52, i.e., to ensure witnesses’ fair opportunity to present testimony, and New York’s legislative scheme regarding public access to courts.
The impact of the Sixth Amendment on public access cases was recognized by Justice Blackmun in his concurring opinion in Richmond. Justice Blackmun lamented that the Supreme Court in Richmond “eschewed the Sixth Amendment route,” arguing that the Sixth Amendment, where the right to a public trial is expressly stated, provides the most appropriate framework by which to decide access issues. (See Richmond, supra at 603; see also Gannett v DePasquale, 443 US 368, 447 [1979] [“(t)o the extent the Constitution protects a right of public access to the proceeding, the standards enunciated under the Sixth Amendment suffice to protect that right”] [Blackmun, J., dissenting].) Commentators too have questioned the Richmond court’s decision to permit a qualified, implicit First Amendment right to “edge out” a fundamental, express Sixth Amendment right. (See, e.g., Sarner, supra.)
*375 Against this backdrop, the court declines to establish a constitutional rule in New York granting the media a right to televise court proceedings. The record is consistent with the traditional approach of New York courts to public access questions, giving great weight to fair trial concerns. The record also is consistent with New York’s statutory scheme which guarantees public trials, but gives primacy to fair trial rights. Moreover, to the extent any changes to the statutory scheme have been put into experimental use, these were initiated and reviewed by the Legislature. A state constitutional rule expanding the rights of the media in New York to include the right to photograph and broadcast court proceedings would derail what is, and always has been, a legislative process.
The court recognizes that important issues raised by audiovisual coverage of trials in New York are not settled now, and, perhaps, always will generate strident opposing views. However, the court agrees with the advice of Chief Administrative Judge Jonathan Lippman: “[sjurely, a prominent public debate on the advisability of cameras in the courts is to be welcomed. But for the sake of certainty and finality it should take place and be resolved in the Legislature . . . .”[20] In sum, the court concludes that there is no right of televised access under article I, § 8 of the New York Constitution.
For all of the above reasons, Court TV fails to make out a prima facie case supporting partial summary judgment. On the other hand, summary judgment is granted to defendants. Accordingly, it is ordered that plaintiff Courtroom Television Network LLC’s motion for partial summary judgment is denied; and it is further ordered that the summary judgment motions of defendants the State of New York, George E. Pataki and Eliot Spitzer are granted; and it is further ordered that, upon a search of the record, summary judgment is granted to defendant Robert Morgenthau; and it is further adjudged and declared that New York Civil Rights Law § 52, on its face, is not unconstitutional under the First Amendment to the United States Constitution; and it is further adjudged and declared that New York Civil Rights Law § 52, on its face, is not unconstitutional under article I, § 8 of the New York Constitution.

. Though Morgenthau does not cross-move for dismissal here, he argues that he is not a proper party to this action, and that there is no “actual case or controversy” for the court to decide, because he has not prosecuted Court TV for violation of Civil Rights Law § 52. As Morgenthau has not moved to dismiss on this basis, the court declines fully to address these arguments. Were Morgenthau to so move, the court would be inclined to deny the application. “The general purpose of the declaratory judgment is to serve some practical end in quieting or stabilizing an uncertain or disputed jural relation either as to present or prospective obligations.” (James v Alderton Dock Yards, 256 NY 298, 305 [1931] [citations omitted and emphasis added].) Consistent with the guidance of the Fourth Department in Matter of Santiago v Bristol (273 AD2d 813 [2000]), Court TV brought this action to settle its prospective obligations under Civil Rights Law § 52. There is an actual controversy, in that some lower courts in New York have concluded recently that section 52 is unconstitutional. (See, e.g., Coleman v O’Shea, 184 Misc 2d 238 [Sup Ct, Nassau County 2000, Winslow, J.]; People v Boss, 182 Misc 2d 700 [Sup Ct, Albany County 2000, Teresi, J.].) Morgenthau is a proper party because he is vested with the power to enforce the statute. (See New York Foreign Trade Zone *330 Operators v State Liq. Auth., 285 NY 272 [1941].) Indeed, courts have held that the declaratory judgment action is particularly appropriate to settle constitutional matters, even in preenforcement situations. (See, e.g., Lewis v American Fedn. of Tel. & Radio Artists, 71 Misc 2d 253 [NY County 1972, Quinn, J.], mod 41 AD2d 707 [1st Dept 1973], affd 34 NY2d 265 [1974] [declaratory judgment action properly brought by newscaster seeking to declare unconstitutional statute requiring union membership as condition of employment].)

. The bill “was passed in the Senate unanimously and with one dissenting vote in the Assembly.” (Statement of Senator Helman regarding L 1952, ch 241, 1952 NY Legis Ann, at 44-45.) The media voiced opposition. For example, Joseph H. McConnell, president of NBC New York, urged Governor Dewey not to approve the bill, on the ground that it unfairly discriminated against “radio, television and motion picture reporting.” (See Bill Jacket, L 1952, ch 241, at 6.)

. See Grygiel, Memorandum of Law of Regional News Network, 63 Alb L Rev 1003, 1019 (2000).

. The Court in Richmond strongly suggested that the First Amendment rights it recognized would also apply in civil trials. (See id. at 580 n 17.) Subsequently, some federal courts have so held. (See, e.g., Westmoreland v Columbia Broadcasting Sys., Inc., 752 F2d 16, 23 [2d Cir 1984], cert denied sub nom. Cable News Network v United States Dist. Ct, 472 US 1017 [1985].)

. See Issues at 4 (“As the May 31, 1989 sunset date of the initial experiment approached, there was much debate concerning the fate of the program, with proponents such as the media, the Cameras in the Courtroom Advisory Committee, and Judge Rosenblatt calling it a success and opponents such as the New York State Bar Association, the New York State Defenders Association and numerous legislators pronouncing the program a failure in terms of its stated purpose”).

. The members of the advisory committee included Dr. Irving Crespi, an opinion research consultant; Dr. Elizabeth E Loftus, a professor of psychology and adjunct professor of law; Richard D. Heffner, a professor of communications and public policy; and Harry M. Rosenfeld, editor of the Albany Times Union. (Crosson Report at [iv].)

. The Honorable Burton B. Roberts, Administrative Judge of the Twelfth Judicial District, was appointed committee chair. The chief administrator’s additional appointments were Honorable Richard A. Brown, the District Attorney of Queens County and Sam Roberts, a New York Times reporter. The Governor’s appointees were Eleanor S. Applewhaite, Esq., General Counsel of the Educational Broadcasting Corporation, S. Paul Conti, Jr., assistant news *345 director of WNYT-TV in Albany, and Edward W Hayes, Esq., an attorney in Manhattan. The Senate Majority Leader’s appointees were Philip M. Damashek of Damashek Godosky & Gentile and Richard N. Winfield, Esq., of Rogers & Wells. The Assembly Speaker’s appointees were Floyd Abrams, Esq., of Cahill Gordon & Reindel and Harry M. Rosenfeld, editor of the Albany Times Union. The Senate Minority Leader’s appointee was Jack T. Litman, Esq., of Litman, Asche, Lupkin & Gioiella. The Assembly Minority Leader’s appointee was Richard Aurelio, president of Time Warner-NYC Cable Group. (Roberts Report at 19.)

. Though Litman doubted the objectivity of members of the press with respect to cameras in courts, he cited Max Frankel, who wrote, in an October 16, 1994 New York Times magazine article, that “the camera is not just another incarnation of ‘press,’ entitled to the unabridged freedom thereof. It’s a different beast that should enter a court by a different door, under different rules . . . .” (Frankel, I Am Not a Camera, New York Times, Oct. 16, 1994, at 28.)

. Cited in Thaler, The Watchful Eye: American Justice in the Age of the' Television Trial, 20 (1994).

. Apparently, four, rather than two, media representatives were appointed to the committee (Feerick Committee). The Governor’s appointees were Richard Alteri, president of the Cable Television and Telecommunications Association of New York; Professor Jay C. Carlisle, II, of Pace University School of Law; and Henry G. Miller of Clark, Gagliardi & Miller. The Chief Judge’s appointees were committee chair John D. Feerick, Dean of Fordham University School of Law; Honorable Friz. W Alexander II, counsel, Epstein, Becker & Green; and Veronica G. Dumas, Assistant District Attorney, Albany County. The Senate Majority Leader’s appointees were Monte Trammer, president and publisher of the Saratogian & Community News, and Professor James M. Tien, chair of the Decision Sciences and Engineering Systems Department at Rensselaer Polytechnic Institute. The Assembly Speaker’s appointees were Leonard Noisette, director of Neighborhood Defender Service of Harlem, and Alissa Pollitz Warden, associate dean of the School of Criminal Justice of the University of Albany. The Senate Minority Leader’s appointee was Dianne Kennedy, president of the New York Newspaper Publishers Association. The Assembly Minority Leader’s appointee was Michelle Rea, executive director of the New York Press Association.

. The section headings are drawn directly from the Feerick Report.

. As an example of the judicial accountability benefit, the Committee also cited the testimony of Steven Brill, who stated (referring to the O.J. Simpson trial) that “[i]t is ridiculous to criticize journalism because journalism covers a public function and makes it look bad. If the system looked bad in that case, that is a benefit of cameras.” (Id. at 32.)

. OCA data regarding media applications between January 31, 1995 and September 1, 1996 showed that “94% of the proceedings in which camera coverage was sought were criminal cases.” (Id.)

. “The Committee received only two specific complaints about the way in which trial judges administered the provisions of Section 218 of the Judiciary Law, only one of which appeared to fall within the period of the legislative mandate.” (Feerick Report at 43.)

. Here, the Committee cited the testimony of Wyoming County Public Defender Norman Effman, who felt that “cameras have an impact” on trial participants. (Feerick Report at 54-55.) Mr. Effman’s clients primarily were “minority inmates charged with committing felonies within the [state] prisons” located within his 99% white county. In these cases, Mr. Effman felt that the presence of cameras would be “a protection against juror bias.” *357 (Roberts Report at 62.) He believed that “jurors will be more inclined to act fairly if they know that people from less homogeneous parts of the State are watching.” (Id.)

. The Committee cited testimony as to witness impairment from Jonathan Gradess, executive director of the New York State Defenders’ Association, Peter Moschetti and Isaiah Gant of the Tennessee Association of Criminal Defense Lawyers. (Feerick Report at 57; but see testimony of Professor Barry Scheck, an attorney in the O.J. Simpson trial, that “television coverage of the Simpson case led a key defense witness to come forward who might otherwise not have realized the relevance of her testimony,” id.)

. For example, Noisette pointed out that only 10% of judges surveyed strongly agreed that television coverage had enhanced public understanding of the judicial system, while 25% strongly disagreed, and 26% somewhat disagreed. (MR2 at 5.) Similarly, 61% of the public in the Marist Poll believed that television in the courtroom was “more a source of entertainment than something that would increase the public’s understanding of the justice system.” (Id.) Noisette wrote that “these statistics resoundingly rebut the bald assertions of self-interested journalists, and they are a dose of reality for those hopeful, disinterested witnesses regarding the educational benefits of cameras in our courts. They are the voice of New Yorkers voting for the sunset of this law.” (Id. at 6.)

. Defendants point out that a 1996 survey of California judges also revealed that witnesses were affected by audiovisual coverage of trials. There, 47% of all judges surveyed, and 59% of those surveyed in the Los Angeles Superior Court, reported observing a change in witness behavior. Those who witnessed a change in witness behavior characterized it predominantly as either “guarded testimony” (49%) or “self-conscious/nervous” (87%). (See Rosen affidavit, exhibit L, attachment 1, question 30.)

. It appears that the inclusion of this provision in the Assembly bill left it with little realistic chance of passage in the Senate, and even offended its initial sponsor, Democratic Assemblyman Mark Weprin of Queens, who dropped his name from the bill. (See, Spencer, Effort on Cameras in Courts Dies, supra at 1.)

. See Lippman, Legislature Should Resolve Cameras in Courts Policy, NYLJ, May 1, 2000, at S1, col 5.